UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                  :

MAURICE OPARAJI,                   :
                                  :

                Plaintiff,      :
                                  :

                                  :          07 Civ. 2124 (GEL)

            -v.-                :
                                  :          **OPINION AND ORDER**

ATLANTIC CONTAINER LINE and     :
PENBROKE MARINE SERVICES, INC., :
                                  :

                Defendants.   :
                                  :
------------------------------------------------------------x

Maurice Oparaji, pro se.

Paul M. Keane, Cichanowicz Callan Keane Vengrow
& Textor LLP, New York, NY, for defendant Atlantic
Container Line.

Garth S. Wolfson, Mahoney & Keane LLP, New York,
NY, for defendant Penbroke Marine Services, Inc.


GERARD E. LYNCH, District Judge:

      Plaintiff Maurice Oparaji brings this action against Atlantic Container Line ("ACL") and

Penbroke Marine Services, Inc. ("Penbroke"), alleging that ACL and Penbroke breached a

maritime contract by failing to deliver three vehicles to the parties' agreed-upon destination port.

Plaintiff also asserts state law claims for breach of fiduciary duty, unfair trade and unfair

business practices, civil conspiracy, deceptive and negligent misrepresentation, fraud, and

defamation. Plaintiff's initial action was filed in the Superior Court of the State of New Jersey,

Union County. The action was subsequently removed to the United States District Court for the

District of New Jersey, which transferred the case to this Court. Defendants move for summary

judgment dismissing all claims, and plaintiff cross-moves for summary judgment as to the breach of contract and defamation claims. For the reasons set forth below, defendants' motions will be granted, and plaintiff's motion will be denied.

## BACKGROUND

The facts set forth below are essentially undisputed, except as otherwise noted.

## I. The Shipping Arrangements

Plaintiff Maurice Oparaji is an importer/exporter of cars. (P. 56.1 Stmt.[1] ¶ 3; ACL 56.1 Stmt. ¶ 1; Compl.[2] ¶ 6.) In the fall of 2005, plaintiff engaged Penbroke to arrange for the transport of six vehicles from New York, New York to Lagos, Nigeria. (Brennan Decl. ¶ 2; P. Mem. Exs. M, U.) The six vehicles consisted of: (1) a 2000 Kia Sephia, (2) a 2000 Honda Civic, (3) a 1997 Nissan Altima, (4) a 1993 Mazda MPV, (5) a 2001 Toyota Precis, and (6) a 1998 Kia Sephia. (P. 56.1 Stmt. ¶¶ 4, 7; P. Mem. Exs. A-F.) In accordance with plaintiff's request, Penbroke arranged for shipment of the vehicles through ACL. (Brennan Decl. ¶¶ 2-3.) ACL ultimately subcontracted the portion of carriage from Italy to Nigeria to a non-party carrier named Grimaldi Compagnia di Navigazione, S.p.A. ("Grimaldi"), which in turn subcontracted that portion of carriage to RoRo Oceanic Shipping Services ("RoRo Lagos").[3] (Heslin Decl. ¶

---

[1] All references to plaintiff's 56.1 statement are to Plaintiff's Affidavit and Statement of Material Facts Pursuant to Rule 56.1 and 28 U.S.C. § 1746, dated October 15, 2007.

[2] All references to the complaint in this action refer to plaintiff's amended complaint dated November 9, 2006.

[3] Plaintiff takes issue with ACL's decision to subcontract for the carriage of his vehicles. (See P. 56.1 Stmt. ¶ 26.) Although plaintiff maintains that he did not authorize ACL to subcontract the shipment (see id.), Section 5.1 of the bill of lading terms and conditions clearly provides that "[t]he carrier shall be entitled to sub-contract on any terms the whole or any part of the carriage." (ACL Mem. Ex. C, at 000050.)

9.)  Thus, ACL transported plaintiff's vehicles from New York to Italy, and RoRo Lagos, acting on behalf of Grimaldi, transported plaintiff's vehicles from Italy to Nigeria.  (<u>Cf</u>. ACL Mem. Exs. K-L.)

Penbroke did not issue a bill of lading for the shipment (Penbroke 56.1 Stmt. ¶ 13; Brennan Decl. ¶ 2), nor did it play any role in the actual transport of the vehicles.  (Mariano Dep. 120:19-22.)  However, it did issue an invoice on October 28, 2005 that memorialized the details of the parties' transaction and "refer[red plaintiff] to the [carrier's] bill of lading" for the "[t]erms of [s]hipping."  (P. Mem. Ex. M.)  The invoice also itemized the ocean freight charges for each of the six vehicles.  (<u>Id</u>.)  Between October 28, 2005 and November 3, 2005, plaintiff prepaid the ocean freight charges for all six vehicles and, in accordance with Penbroke's instructions, delivered the vehicles to Maher Terminal, Berth 64, where they would be loaded for transport.  (P. 56.1 Stmt. ¶¶ 8-9; P. Mem. Exs. G-L; Oparaji Dep. 46:10-15.)  At that time, plaintiff received dock receipts for each of the vehicles.  (P. Mem. Exs. G-L.)  Among other things, each dock receipt listed the names of the shipper and consignee, the origination and destination ports, the date the vehicles were received, a description of the vehicles (including the year, make, model, and VIN), and confirmation that plaintiff prepaid the freight charges.  (<u>Id</u>.) The receipts also included the following notice:

> Received the above described goods or packages subject to all the terms of the undersigned's regular form of dock receipt and bill of lading which shall constitute the contract under which the goods are received, copies of which are available from the carrier on request and may be inspected at any of its offices.

(<u>Id</u>.)

## II.     The Bill of Lading

On November 21, 2005, ACL generated a bill of lading for the transport of plaintiff's vehicles.  (ACL 56.1 Stmt. ¶ 3; ACL Mem. Ex. C Bill of Lading No. ACLU 5324S1332594 ("bill of lading"); Brennan Decl. ¶ 3; cf. Compl. ¶¶ 13, 25-32.)  Plaintiff denies ever receiving the bill of lading.  (P. 56.1 Stmt. ¶ 10; Compl. ¶ 13; P. Suppl. 56.1 Stmt.[4] ¶¶ 3-4.)  However, plaintiff did receive two emails generated by ACL and forwarded by Penbroke, each of which contained a bill of lading reference number for three of the six vehicles, and both of which appear to have attached the ACL and Grimaldi bills of lading corresponding to the carriage from New York to Italy and from Italy to Nigeria.  (P. Suppl. 56.1 Stmt. ¶ 3; P. Mem. Exs. P-Q.)  The ACL bill of lading for the three missing vehicles provides a description of the vehicles and identifies plaintiff as the consignee and Cartainer Ocean Line (Penbroke) as the "forwarder." (ACL Mem. Ex. C.)  It also contains the following provisions pertinent to resolution of the current dispute:

> 3. Carrier's Responsibility - Paramount Clause
> (1) For U.S. Trade Route: This bill of lading shall take effect subject to the provisions of the U.S. Carriage of Goods by Sea Act, 1936 (COGSA) insofar as it is compulsorily applicable.  Further, it is agreed that COGSA, including all its limitations and defenses, and the U.S. Pomerene Act, 1916, shall apply by contract to all shipments to or from the United States before loading and after discharge from the time the goods are received by the Carrier at the Place of Recipt or Port of Loading until delivered by the Carrier at the Port of Discharge or Place of Delivery, as applicable.

---

[4] All citations to plaintiff's supplemental 56.1 statement refer to Plaintiff Maurice Oparaji's Response to Defendants' Statement of Material Facts Pursuant to Rule 56.1, dated October 15, 2007.

11. Matters Affecting Performance
(2) The liability of the Carrier in respect of the goods shall cease
on the delivery or other disposition of the goods in accordance
with the orders or recommendations given by any government or
authority or any person acting or purporting to act as or on behalf
of such government or authority.

(Id. at 000050.)

## III.    Arrival of the Goods

The RoRo Lagos vessels carrying plaintiff's vehicles arrived at the Port of Lagos in

December 2005 and January 2006. (ACL Mem. Exs. E-F.)  Although the three missing vehicles

were spread among two different vessels, tally sheets kept by RoRo Lagos and the NPA show

that all three of plaintiff's missing vehicles were present at the time of the vessels' arrivals.  (Id.)

Following arrival at Lagos, plaintiff's vehicles were discharged into the custody of the Nigerian

Port Authority ("NPA"), which eventually transferred the vehicles to the NPA car park.  (ACL

56.1 Stmt. ¶ 5; ACL Mem. Ex. F.)  The NPA is an agency of the Nigerian Government that is

charged by law with controlling the discharge of cargo from vessels docking at the Port of

Lagos.  (ACL 56.1 Stmt. ¶ 6; Atoyebi Decl. ¶¶ 17-18; id. Ex. B, at Pt. I.)  Stevedores hired and

controlled by the NPA discharge all imported cargo, at which point the NPA assumes sole

control over the care, custody and delivery of the cargo.  (ACL 56.1 Stmt. ¶¶ 7-10; Heslin Decl.

¶¶ 7-8; Atoyebi Decl. ¶¶ 18-19, 22; cf. id. Ex. B, at Pt. II  7(b), 8(e), 8(h).)  By law and custom,

shipowners and ocean carriers destined for the Port of Lagos have no control over the NPA or its

hired stevedores.  (Atoyebi Decl. ¶¶ 21-22.)  Indeed, neither ACL nor Penbroke employed any

personnel at the Port of Lagos or at the NPA car park.  (Brennan Decl. ¶ 5; cf. ACL 56.1 Stmt. ¶¶

6-10.)

On or about December 22, 2005, plaintiff visited the office of RoRo Lagos.  (P. 56.1 Stmt. ¶ 12.)  Upon presenting his American passport, Nigerian passport, and driver's license, he obtained three of the six vehicles transported by ACL, via Grimaldi and RoRo Lagos.  (Id.) However, after failing to locate or receive the remaining three vehicles – a 2000 Kia Sephia, a 2000 Honda Civic, and a 1997 Nissan Altima – plaintiff contacted Penbroke and returned to the United States.  (P. 56.1 Stmt. ¶¶ 13-14.)

## IV.    The Bakreen and Tanimowo Emails

On July 5, 2006, following his return to the United States, plaintiff received a telephone call from one Alli Hitman, an individual whom plaintiff met while searching for his three missing vehicles in the NPA car park.  (P. 56.1 Stmt. ¶ 15.)  According to plaintiff, Hitman informed him that two of his three missing vehicles had been located.  (Id.)  On July 6, 2006, plaintiff emailed various Penbroke, ACL, Grimaldi, and RoRo Lagos employees, informing them of this news and advising them not to release the vehicles to anyone until further notice.  (P. 56.1 Stmt. ¶ 15; P. Mem. Ex. R; ACL Mem. Ex. H.)  In response, Semiu Bakreen ("Bakreen") and Thomas Tanimowo ("Tanimowo"), employees of RoRo Lagos, distributed emails (collectively, the "Bakreen and Tanimowo emails") commenting on plaintiff's predicament to various Penbroke, ACL, Grimaldi, and RoRo Lagos employees.[5]  (P. Mem. Exs. S-T; ACL Mem. Exs. G-H.)

The email authored by Bakreen stated, in relevant part:

> Ref. to your below message, we hereby wish to state that we have
> carried out our investigations and discovered that you fraudulently

---

[5] The portions of the Bakreen and Tanimowo emails quoted below are reproduced exactly as they were written.

arranged with your contacts at NPA/Clearing agent to take
delivery of the vehicles by not releasing from our Agency.

Pls note that your contacts have confirmed that you are fully aware
of all transactions relating to clearing of the vehicles.

At this stage and with the facts on hand the Line is not responsible
for the alleged Missing vehicles as you claimed. Your contacts
Mr. Alli Hitman-Tel. 08033816946 and the NPA terminal manager
car park D who are in the custody of the vehicles will be willing to
testify on the issue with the Police Authority at anytime you are
prepared to make the matter a police case. We are also ready to
present all landing evidences to prosecute you and your contacts.

Whilst it is not our policy to join issues with our client, your action
is a betrayal of good business relationship and that we are prepared
at anytime you are around in the country to take the matter up with
you. Claim Dept.r.i.c., pls ignore whatever claim the shipper may
submit.

(P. Mem. Ex. S.) In a separate email, Tanimowo wrote, in relevant part:

It is regrettable to have this kind of fraudulent person as a client.
Therefore, I will strongly suggest that the Ship's Agent keep a tag
on him and if possible be refusing his booking henceforth, subject
however to the Line's agreement.

(P. Mem. Ex. T.)

## V.     The Parties' Contentions

Plaintiff asserts a variety of causes of action arising from the parties' transaction. In light

of his failure to receive three of the six vehicles shipped using Penbroke and ACL's services,

plaintiff claims that defendants have breached their contracts and are liable for the cost of the

three vehicles and other damages. (Compl. ¶¶ 8-17, 22-23, 25-32.) Plaintiff also contends that

defendants are liable for defamatory statements in the Bakreen and Tanimowo emails. (Compl.

¶¶ 60-64.) Finally, plaintiff raises a host of other state law claims, including breach of fiduciary

duty, unfair trade and unfair business practices, civil conspiracy, deceptive and negligent misrepresentation, and fraud.  (Compl. ¶¶ 33-64.)

For their part, defendants argue that they fully performed all contractual obligations owed to plaintiff.  (ACL Mem. at 4-7; Penbroke Mem. at 1-4.)  Defendants further contend that plaintiff's defamation claim is defeated by lack of publication, the application of a qualified privilege, and the absence of an agency relationship between themselves and either of the third parties who communicated the defamatory material.  (ACL Mem. at 14-15.)  Finally, defendants argue that plaintiff has advanced no evidence entitling him to recover on any of his remaining state law claims.  (ACL Mem. at 8-11; Penbroke Mem. at 6-7.)

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the "burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).  However, when moving against a party who will bear the ultimate burden of proof on an issue, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (noting that a "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on

an essential element of her case with respect to which she has the burden of proof") (internal quotation marks omitted).

Once the moving party has satisfied its burden, the burden then shifts to the nonmoving party to come forward with affidavits, depositions, interrogatories or other sworn evidence sufficient to create a genuine issue of material fact for trial.  See Fed. R. Civ. P. 56(e)(2); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The nonmoving party may not satisfy this burden simply by "show[ing] that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586; see also Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (holding that a nonmovant cannot defeat a motion for summary judgment "merely . . . on the basis of conjecture or surmise"), quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (internal quotation marks omitted).  Rather, the nonmovant must advance "enough evidence to support a jury verdict in its favor."  Trans Sport, Inc., 964 F.2d at 188.

In ruling on a motion for summary judgment, a court must construe all evidence in the light most favorable to the nonmoving party, including resolving all ambiguities and drawing all factual inferences in the nonmoving party's favor.  Rule, 85 F.3d at 1011; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Trans Sport, Inc., 964 F.2d at 188.  A court must neither make judgments regarding credibility or conflicting versions of events, nor engage in any weighing of the evidence, as a court resolving a motion for summary judgment is tasked not with resolving disputed issues of fact, but instead with determining whether any genuine issues of material fact remain to be tried.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Rule, 85 F.3d at 1011.  For purposes of making this determination, an issue is

material if it "might affect the outcome of the suit under the governing law." Shade v. Hous.

Auth. of City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001), quoting Anderson, 477 U.S. at

248 (internal quotation marks omitted).

## II.     Breach of Contract

### A.     Penbroke

Plaintiff makes no distinction between the contractual obligations assumed by Penbroke

and those assumed by ACL and asserts that both Penbroke and ACL are liable for non-delivery

of goods.  In response to plaintiff's claims, Penbroke argues that its status as plaintiff's freight

forwarder absolves it of any liability for cargo damage or loss.  Even viewing the facts in the

light most favorable to plaintiff, the limited responsibility undertaken by freight forwarders

defeats plaintiff's attempt to hold Penbroke liable for the non-delivery of his vehicles.

Freight forwarders are intermediaries that "make arrangements for the movement of

cargo at the request of clients."  Prima U.S. Inc. v. Panalpina, Inc., 223 F.3d 126, 129 (2d Cir.

2000).  In doing so, they typically "secure[] cargo space . . . , give[] advice on governmental

licensing requirements, proper port of exit and letter of credit intricacies, and arrange[] to have

the cargo reach the seaboard in time to meet the designated vessel."  Id., quoting New York

Foreign Freight Forwarders & Brokers Ass'n v. Fed. Maritime Comm'n, 337 F.2d 289, 292 (2d

Cir. 1964).  Unlike carriers, freight forwarders play no role in the actual transport of cargo.  Id.

Moreover, because "a freight forwarder does *not* issue a bill of lading, [it] is [generally]. . . not

liable to a [cargo owner] for anything that occurs to the goods being shipped."  Id. (emphasis in

original).  In short, once a freight forwarder arranges for the transportation of cargo from one

point to another, that arrangement "fulfills the forwarder's obligations in the absence of proof

that the selection [of the carrier] itself was negligent." Id. at 130; see Scholastic Inc. v. M/V Kitano, 362 F. Supp. 2d 449, 458-59 (S.D.N.Y. 2005).

Based on the record evidence, it is clear that Penbroke acted solely in its capacity as a freight forwarder. In accordance with industry custom, Penbroke never issued plaintiff a bill of lading (see Penbroke 56.1 Stmt. ¶ 13; Brennan Decl. ¶ 2), nor did it play any role in the actual transport of plaintiff's goods. (See Mariano Dep. 120:19-22.) Instead, as evidenced by the documents that it did issue to plaintiff, Penbroke unequivocally represented that the terms of the contract of carriage would be dictated by the bill of lading issued by the carrier. (See P. Mem. Exs. G-M.) Penbroke's status as plaintiff's agent solely for the narrow purpose of arranging shipment is further confirmed by the explicit direction given Penbroke by plaintiff, who signed and acknowledged a form granting Penbroke his power of attorney "to accomplish and furnish the necessary and required papers in connection with the shipment of the above described vehicle pursuant to [the U.S. customs regulations governing the export of used vehicles]." (P. Mem. Ex. U.) That is precisely the sort of function that freight forwarders typically perform.

In the face of this evidence confirming Penbroke's status as freight forwarder, plaintiff has failed to produce any evidence calling Penbroke's status into question or otherwise suggesting that Penbroke undertook some obligation other than those typically assumed by freight forwarders. That plaintiff himself admits that this was not the first time he engaged Penbroke's services (see P. 56.1 Stmt. ¶ 6; P. Mem. Ex. V) only bolsters the conclusion that he was fully aware of Penbroke's status as freight forwarder.

Plaintiff presents no evidence that Penbroke failed to fulfill its obligations as a freight forwarder. Plaintiff does not dispute, and the evidence confirms, that Penbroke not only

arranged for plaintiff's vehicles to be transported from New York to Nigeria, but also advised

plaintiff as to when and where he should present the vehicles for loading.  (P. 56.1 Stmt. ¶¶ 7, 9;

P. Mem. Exs. G-L; Oparaji Dep. 46:10-15.)  Nor has plaintiff alleged, much less presented

evidence, that Penbroke was negligent in its selection of ACL as carrier.  Thus, it is beyond

dispute that Penbroke satisfied its obligations as plaintiff's freight forwarder.  See, e.g., Prima,

223 F.3d at 129.  Accordingly, Penbroke's motion for summary judgment is granted as to

plaintiff's breach of contract claim.

> B.     ACL

> 1.     Federal Maritime Law Standards

In resolving a claim for breach of a shipping contract, the starting point for analysis is the

bill of lading.[6]  See Fed. Ins. Co. v. Great White Fleet (US) Ltd., No. 07 Civ. 2415, 2008 WL

2980029, at *7 (S.D.N.Y. Aug. 1, 2008).  Where a bill of lading "requires substantial carriage of

goods by sea," the bill is considered a maritime contract, and its interpretation is generally

governed by federal law.[7]  Norfolk Southern Ry. Co. v. Kirby, 543 U.S. 14, 22-23, 27 (2004).

---

[6] "A bill of lading records that a carrier has received goods from the party that wishes to
ship them, states the terms of carriage, and serves as evidence of the contract for carriage."
Norfolk Southern Ry. Co. v. Kirby, 543 U.S. 14, 18-19 (2004).  Although plaintiff contends that
he never received a bill of lading (see Compl. ¶ 13; P. 56.1 Stmt. ¶ 10), he is still bound by its
terms.  See, e.g., Salis v. Am. Export Lines, No. 07 Civ. 5949, 2008 WL 1947035, at *4-5
(S.D.N.Y. Apr. 30 2008); Anvil Knitwear, Inc. v. Crowley Am. Transport, Inc., No. 00 Civ.
3243, 2001 WL 856607, at *2 (S.D.N.Y. July 27, 2001).  Moreover, it is generally accepted that
a cargo owner accepts a bill of lading when he sues on it.  See A.P. Moller-Maersk A/S v. Ocean
Express Miami, 550 F. Supp. 2d 454, 464 (S.D.N.Y. 2008) (collecting cases).

[7] The only instance in which federal law does not control the interpretation of a maritime
contract is where a dispute is so "inherently local" as to compel the interpretation of the contract
according to state law.  Norfolk, 543 U.S. at 22-23, 27.  Because the intercontinental shipment in
this case is the very opposite of "inherently local," federal law, including federal common law
where appropriate, applies.  See Sompo Japan Ins. Co. v. Union Pacific R.R. Co., 456 F.3d 54,

Defendants argue that in addition to the terms of the bill of lading, COGSA, the Carriage of Goods by Sea Act, 46 U.S.C. app. § 1300 et seq., also governs the present dispute. As a matter of statutory law, COGSA applies to "[e]very bill of lading . . . for the carriage of goods by sea to or from ports of the United States, in foreign trade," id. § 1300, "from the time when the goods are loaded on to the time when they are discharged from the ship." Norfolk, 543 U.S. at 29, quoting 46 U.S.C. app. § 1301(e) (internal quotation marks omitted). Once goods have been discharged from a vessel, however, the terms of the Harter Act, 46 U.S.C app. § 190 et seq., not COGSA, control.[8] See Sompo Japan Ins. Co. v. Union Pacific R.R. Co., 456 F.3d 54, 70 n.15 (2d Cir. 2006); Seanto Exports v. United Arab Agencies, 137 F. Supp. 2d 445, 449 (S.D.N.Y. 2001) ("The Harter Act governs the responsibilities of carriers after discharge and before delivery.") (citation omitted). Because the tally sheets brought forward by ACL clearly demonstrate that plaintiff's vehicles were discharged at the Port of Lagos (see ACL Mem. Exs. E-F; Heslin Decl. ¶¶ 5-6), this case is governed by the Harter Act.

The Harter Act, a statute primarily "concerned with the circumstances under which a carrier's responsibility for damage to cargo terminates," Lithotip, CA v. S.S. Guarico, 569 F. Supp. 837, 838 (S.D.N.Y. 1983), "declares void any attempt by carriers to contract out of

---

74 (2d Cir. 2006) (noting that federal common law "plays a more prominent role in the maritime context than in others . . . [but] . . . only applies in the absence of a relevant statute.").

[8] Of course, parties may (as the parties have done here) adopt contractual provisions extending COGSA's application to the periods before loading and after discharge but prior to delivery. See 46 U.S.C. app. § 1307; Sompo, 456 F.3d at 58. However, when extended by contract, COGSA "does not apply of its own force, or *ex proprio vigore*, but rather as a contractual term." Sompo, 456 F.3d at 69. Thus, where a COGSA provision incorporated by reference in a bill of lading conflicts with the terms of the Harter Act, the Harter Act controls. Id. at 71-72.

liability under maritime law for acts of misfeasance such as misdelivery and negligence in handling cargo."[9] Chilewich Partners v. M.V. Alligator Fortune, 853 F. Supp. 744, 754 (S.D.N.Y. 1994). By its terms, a carrier retains responsibility for cargo, including the damage or loss thereof, until "proper delivery" has been made. See Seanto, 137 F. Supp. 2d at 449; United States v. Afram Lines (USA), No. 90 Civ. 6850, 1995 WL 224616, at *11 (S.D.N.Y. Apr. 14, 1995) ("[U]nder the Harter Act a carrier is liable for any damage to or loss of cargo caused by the negligence of the carrier when such loss or damage occurs prior to loading on the vessel, or after discharge and prior to delivery."). The Harter Act does not itself define the term "proper delivery." Rather, the Act "preserves the pre-existing maritime common law obligation of proper delivery." Chilewich, 853 F. Supp. at 754; see also Farrell Lines Inc. v. Highlands Ins. Co., 696 F.2d 28, 29 (2d Cir. 1982) ("The Harter Act reinstated the common law duty of carriers to deliver the goods from wharf to wharf, notify the consignee of the vessel's arrival and . . . protect the cargo until the consignee ha[s] a reasonable opportunity to remove it.").

Under the common law, proper delivery may be either actual or constructive. See Seanto, 137 F. Supp. 2d at 449. Actual delivery occurs where the carrier completely transfers possession and control of the goods to the consignee or his agent. See id. Constructive delivery, on the other hand, "occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods or put them under proper care and custody." Id.,

---

[9] COGSA contains a similar provision, which provides that "[a]ny clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect." 46 U.S.C. app. § 1303(8).

quoting <u>C.P. USA v. Mercury</u>, No. 99 Civ. 4183, 2000 WL 1576885, at *2 (S.D.N.Y. Oct. 23, 2000) (internal quotation marks omitted).  Notwithstanding these definitions, "[n]o rule is better settled than that the delivery must be according to the custom and usage of the port, and such delivery will discharge the carrier of his responsibility."  <u>Constable v. Nat'l Steamship Co.</u>, 154 U.S. 51, 63 (1894); <u>see also</u> <u>Servicios-Expoarma, C.A. v. Indus. Maritime Carriers, Inc.</u>, 135 F.3d 984, 993 (5th Cir. 1998) ("[W]hile contract and maritime law generally will dictate into whose custody an ocean carrier is required to deliver cargo, such law will be overriden by the established law or custom of the port of delivery."); <u>Farrell</u>, 696 F.2d at 29; <u>Tan Hi v. United States</u>, 94 F. Supp. 432, 436 (N.D. Cal. 1950).

Finally, even where a bill of lading purports to define the carrier's obligation of proper delivery, the relevant provision will be enforced only if it passes muster under the Harter Act.  <u>See</u> <u>Allstate Ins. Co. v. Imparca Lines</u>, 646 F.2d 166, 168 (5th Cir. 1981).

## 2. The Standards Applied

Plaintiff claims that defendants are liable for the non-delivery of goods based solely on the allegation that plaintiff was never able to take possession of three of the six vehicles following their discharge at the Port of Lagos.  ACL, in turn, argues that because it effected proper delivery when it turned all six of plaintiff's vehicles over to the NPA, it has fully complied with its contractual obligations under the bill of lading and applicable federal law.

The Court assumes as true plaintiff's allegation that he has been deprived of goods to which he is lawfully entitled.  The issue here, however, is whether ACL is liable for that deprivation.  If ACL effected proper delivery by discharging the vehicles to the NPA, it cannot be held liable for any subsequent damage or loss.  If, as plaintiff contends, ACL could only have

effected proper delivery by giving plaintiff actual possession of the vehicles, plaintiff is entitled to recover for his loss, as neither party disputes that ACL failed to deliver actual possession of the vehicles. Thus, the threshold question is what constitutes proper delivery under the circumstances.

Section 11 of the bill of lading terms and conditions, entitled "Matters Affecting Performance," reads:

> (2) The liability of the Carrier in respect of the goods shall cease on the delivery or other disposition of the goods in accordance with the orders or recommendations given by any government or authority or any person acting or purporting to act as or on behalf of such government or authority.

(ACL Mem. Ex. C, at 000050.) Having come forward with admissible evidence that plaintiff's cargo was discharged to the NPA (see ACL Mem. Exs. E-F; Heslin Decl. ¶¶ 5-6), and that the NPA is an agency of the Nigerian Government (see Atoyebi Decl. ¶ 17; id. Ex. B, at Pt. I),[10] ACL argues that it has demonstrated fulfillment of the obligation of proper delivery under the bill of lading.

---

[10] Plaintiff argues that the tally sheets showing that his vehicles were discharged to the NPA at the Port of Lagos are insufficient to prove that his vehicles actually reached Nigeria because they are "doctored documents that are not completed as prescribed – no name of the checker, no name of the clerk, and no name of the receiver." (P. 56.1 Stmt. ¶ 24; see also P. Suppl. 56.1 Stmt. ¶ 5.) Plaintiff also denies that the NPA is an agency of the Nigerian Government responsible for controlling all activity at the Port of Lagos. (P. Suppl. 56.1 Stmt. ¶¶ 6-10.) However, a party opposing summary judgment may not create a genuine issue of fact "merely . . . on the basis of conjecture or surmise." Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992), quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (internal quotation marks omitted). Plaintiff has advanced no admissible evidence undermining the validity of the tally sheets or their admissibility as business records, nor has he advanced any admissible evidence challenging the conclusions of ACL's expert on Nigerian maritime law. Consequently, plaintiff has failed to demonstrate that either of these contentions raises a genuine issue of material fact.

The analysis, however, does not end there.  A term purporting to define proper delivery, and thus absolve a carrier of any liability for subsequent losses, must pass muster under the Harter Act.  See Allstate, 646 F.2d at 168.  To the extent that the bill of lading deems proper delivery to occur prior to the time that proper delivery would occur under the Harter Act and the federal common law that it incorporates, the provision contained in the bill of lading is unenforceable.  Thus, regardless of the terms of the bill of lading, ACL may not prevail unless discharging goods to the NPA also constitutes proper delivery under the Harter Act.

The court in Tan Hi v. United States, a seminal case on this issue, concluded that "delivery to customs or other authorities does not relieve the carrier of responsibility for cargo [under the Harter Act], if such authorities are not actually charged by law or usage with the duty to receive cargo and distribute it to the consignee."  94 F. Supp. at 435.  However, where the law of the port at issue "require[s a carrier] to deliver all cargo to the customs agents who [a]re charged with complete responsibility for safe delivery to the consignee[]," proper delivery occurs at the instant the carrier turns the cargo over to the government-controlled authorities.  Id. at 435-36.  Courts in this circuit and others have since recognized this rule.[11]

---

[11] See, e.g., Lithotip, 569 F. Supp. at 838 ("Under [the Harter] Act, the carrier is not responsible for damage to the cargo after 'proper delivery,' which has been defined by case law to mean, *inter alia*, delivery to the custody of a duly authorized port authority.") (citing Allstate, 646 F.2d at 166); Farrell Lines Inc. v. Highlands Ins. Co., 532 F. Supp. 77, 78, 80 (S.D.N.Y. 1982) (concluding that a carrier effected proper delivery under the Harter Act where, in accordance with port custom and usage, it discharged cargo into the hands of a "Liberian governmental entity that ha[d] exclusive authority for the regulation of the Port of Monrovia and direct[ed] and control[led] all activities conducted at the Port"), aff'd 696 F.2d 28 (2d Cir. 1982). See also U.N./F.A.O. World Food Programme v. M/V Tay, 138 F.3d 197, 201-02 (5th Cir. 1998) (noting that when a "vessel owner loses practical control over the discharge of the cargo, . . . [he] is no longer responsible for the acts of the stevedore and the cargo is considered delivered when the ship's hatches are opened" and upholding the lower court's conclusion that because stevedores appointed and controlled by the Angolan government discharged the cargo at issue,

In this case, ACL did not discharge plaintiff's vehicles to the NPA simply for the sake of expediency or on the basis of some other discretionary consideration. Rather, as ACL has shown through the sworn testimony of its expert on Nigerian maritime law, all vessels delivering cargo to the Port of Lagos were required to discharge their cargo into the custody of the NPA using NPA provided and controlled stevedores. (See Atoyebi Decl. ¶¶ 18-19, 21-22; cf. id. Ex. B, at Pt. II 7(b), 8(e), 8(h).)

Case law confirms that Nigerian law and custom do, in fact, mandate discharge of cargo to the NPA upon arrival at the Port of Lagos. In Tapco Nigeria, Ltd. v. M/V Westwind, 702 F.2d 1252 (5th Cir. 1983), plaintiff Tapco sought to hold the vessel owner liable for the loss of rice that occurred when stevedores hired by the NPA spilled the rice while discharging it from the vessel, thereby permitting it to be pilfered. See id. at 1253-54. Tapco argued that the vessel owner violated the Harter Act's requirement of proper delivery when it released the rice into the custody of the NPA stevedores. See id. at 1255. The vessel owner, however, maintained that "release of the bagged cargo to the Nigerian stevedores was not only proper but required, and so delivery was according to the custom and usage of the port." Id.

Applying the rule announced in Tan Hi "that the common law requirements of proper delivery are modified by the custom, regulations, or law of the port of destination," id., the court

_____

proper delivery occurred when the ship opened its hatches); Allstate, 646 F.2d at 169 (concluding that where an organization of the Venezuelan government "ha[d] the sole responsibility of unloading, storing and delivering all cargo," delivery occurred "when the cargo was placed on the dock in the custody of the INP"). But see Afram, 1995 WL 224616, at *4, 12 (noting that there was no proper delivery upon discharge to port authorities where a governmental authority took "no control over the cargo . . . beyond preventing its removal from the port area and retaining the right to inspect the cargo," and where the cargo was instead "placed in the custody of one of the independent port agents" pending clearance by the government).

found that the central inquiry governing the vessel owner's compliance with the Harter Act's requirement of proper delivery was "whether delivery was 'to persons charged by the law and usage of the port with the duty to receive cargo and distribute it to the consignee.'" Id. at 1257, quoting Allstate, 646 F.2d at 168. After finding that "the carrier properly provided safe delivery to the farthest point that it could deliver[] the goods within the limitations of the law, custom, and usage of the port," id. at 1258, the court held that "[t]he release of the cargo to the Nigerian stevedores was a proper discharge and delivery according to the law and custom of the Port of Lagos." Id. at 1260. In reaching this conclusion, the court noted that the NPA, which it found to be an agency of the Nigerian Government, "appoints the persons to perform the services of pilotage, towing, line handling and stevedoring." Id. at 1254. Under this regulatory scheme, the court continued, "vessel interests have absolutely no control over which stevedores are hired to discharge the vessel. Nor do the vessel interests participate in any way in the discharge." Id.

The Fifth Circuit's reasoning in Tapco, a case on all fours with the present action, is persuasive. In light of ACL's evidence showing that at the time of shipment the Nigerian Government continued to mandate that the NPA exercise exclusive custody and control of incoming cargo at the Port of Lagos, and in light of plaintiff's failure to offer any countervailing evidence, as a matter of law proper delivery under the Harter Act occurred at the moment the vessel carrying plaintiff's vehicles permitted the NPA's stevedores to discharge the vehicles into the custody of the NPA.[12] ACL is not responsible for whatever happened to the vehicles after

_____

[12] To the extent that Section 1304(2)(q) of COGSA also applies as a matter of contract, the outcome would be the same. See Metalimport of Romania v. S.S. ITALIA, 426 F. Supp. 770, 773 (S.D.N.Y. 1976) (concluding that under Section 1304(2)(q) of COGSA, a carrier could not be held liable for cargo damage or loss where the stevedores that discharged the cargo "were controlled by the Romanian Government and . . . every ship coming into Costanza had to use

that point.[13]

Accordingly, because proper delivery under both the bill of lading and the Harter Act occurred upon discharge of plaintiff's vehicles to the NPA, ACL's motion for summary judgment is granted with respect to plaintiff's breach of contract claim.[14]

## III. Defamation

Plaintiff next argues that the Bakreen and Tanimowo emails render defendants liable for defamation. Bakreen and Tanimowo, employees of RoRo Lagos, distributed the emails to plaintiff and to a number of employees of ACL, Penbroke, Grimaldi, and RoRo Lagos in July 2006, after plaintiff emailed RoRo Lagos to press the issue of his missing vehicles. (See ACL Mem. Exs. G-H.) The first email, distributed by Bakreen, accused plaintiff of having "fraudulently arranged with [his] contacts at NPA/Clearing agent to take delivery of the vehicles by not releasing from our Agency." (P. Mem. Ex. S; ACL Mem. Ex. G.) The second email,

them whether they wished to or not"); Tapco, 702 F.2d at 1259-60 (applying Section 1304(2)(q) of COGSA and concluding that because a vessel owner had no control over either the stevedores discharging the vessel or the cargo itself, and because this "total lack of control [was] compelled by law, the carrier could not be negligent and could not be responsible" for any damage or loss).

[13] To the extent that plaintiff relies on the rule that "a delivery according to the usage or law of the port cannot be a proper delivery if the cargo is thereby subjected to unusual risks," any risks inherent in the vessel's discharge to the NPA were "risk[s] to which the cargo [is] subjected by virtue of port law," not by virtue of the carrier's actions. Id. at 1258. As the Fifth Circuit noted in Tapco, the NPA "demand[s] sole control of an operation which otherwise would [be] part of the ocean carrier's function of discharge and delivery." Id. at 1256. Thus, given that ACL "was charged with the obligation to deliver [the vehicles] to Lagos, and the only delivery allowed by law was at the hands of the Nigerian stevedores," id. at 1258, ACL's actions were entirely proper.

[14] Because neither defendant is liable for breach of contract, it is unnecessary to reach ACL's argument that COGSA limits its liability for any cargo damage or loss to $500 per package (ACL Mem. at 16-19), or Penbroke's argument that it is entitled to indemnification (Penbroke Mem. at 7-8).

drafted and distributed by Tanimowo, was part of an email chain responding to an earlier communication by plaintiff advising that one Alli Hitman had informed plaintiff that two of his vehicles had been located. (P. 56.1 Stmt. ¶ 15; P. Mem. Exs. R, T; ACL Mem. Ex. H.) In that email, Tanimowo referred to plaintiff as a "fraudulent person" and recommended that the shipping lines refuse his business in the future. (P. Mem. Ex. T; ACL Mem. Ex. H.)

"Defamation in word or print is cognizable in an action for libel." Rosenberg v. Metlife, Inc., 453 F.3d 122, 123 n.1 (2d Cir. 2006). Under New York law, a plaintiff states a claim for libel where he can establish the following five elements: (1) "a written defamatory statement of fact concerning the plaintiff," (2) "publication to a third party," (3) "fault (either negligence or actual malice depending on the status of the libeled party)," (4) "falsity of the defamatory statement," and (5) "special damages or per se actionability (defamatory on its face)." Id., quoting Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 176 (2d Cir. 2000). No claim for defamation lies, however, where the published statement either is absolutely or conditionally privileged. See Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 169 (2d Cir. 2003).

Defendants oppose plaintiff's claim on numerous grounds, arguing that (1) the statements are protected expressions of opinion, (2) the statements were not published, (3) the statements are protected by qualified privilege, and (4) neither Bakreen nor Tanimowo operated under defendants' direction and control such that defendants may be held vicariously liable for their acts. Assuming, arguendo, that the challenged statements are defamatory and that they were published,[15] the statements cannot support a defamation claim against defendants, because they

---

[15] There is considerable merit to plaintiff's position on both of these issues. A statement is defamatory *per se* where it accuses an individual of, and imputes to his business or trade, "fraud, dishonesty, misconduct, and unfitness." Gatz v. Otis Ford, Inc., 691 N.Y.S.2d 113, 114

are privileged and because they cannot be imputed to defendants.

A.    Qualified Privilege

An individual's defamatory communication is afforded qualified protection where the communication is "made by one person to another upon a subject in which both have an interest." Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 98 (2d Cir. 2000), quoting Stillman v. Ford, 22 N.Y.2d 48, 53 (1968). Once a showing sufficient to invoke qualified privilege has been made, the privilege will be defeated only upon a plaintiff's proof of excessive publication or malice. See Konikoff, 234 F.3d at 98-99; Boyd v. Nationwide Mutual Ins. Co., 208 F.3d 406, 410 (2d Cir. 2000).

Applying this standard, the Bakreen and Tanimowo emails are protected by a qualified privileged. The authors and recipients of the emails all shared a common interest in the emails' subject matter, namely the integrity of a customer alleging wrongdoing on the part of the various entities involved in the shipment of that customer's goods and the businesses' appropriate future courses of action. While this shared interest is no bar to a finding that publication has occurred, it is a valid basis for invoking the protection of qualified privilege. See, e.g., Slue v. New York Univ. Med. Ctr., No. 04 Civ. 2087, 2006 WL 212294, at *2 (S.D.N.Y. Jan. 26, 2006); Pirre v. Printing Developments, Inc., 468 F. Supp. 1028, 1042 (S.D.N.Y.), aff'd 614 F.2d 1290 (2d Cir.

_____

(2d Dep't 1999); see also DiBella v. Hopkins, 187 F. Supp. 2d 192, 201 (S.D.N.Y. 2002). Moreover, so long as a libelous statement is read by someone other than the person libeled and the person communicating the libel, the fact that the statement "is communicated solely between employees of a single corporate defendant" will not defeat a finding of publication. Zayac v. Henri Bendel, No. 91 Civ. 5456, 1992 WL 230480, at *3 (S.D.N.Y. Sept. 1, 1992). See also Loughry v. Lincoln First Bank, N.A., 67 N.Y.2d 369, 377 (1986); Pirre v. Printing Developments, Inc., 468 F. Supp. 1028, 1041 (S.D.N.Y.), aff'd 614 F.2d 1290 (2d Cir. 1979). Because plaintiff's libel claim fails in any event, it is unnecessary to reach these issues.

1979); <u>Loughry v. Lincoln First Bank, N.A.</u>, 67 N.Y.2d 369, 376 (1986). Because plaintiff has presented no evidence of excessive publication or malice, his defamation claim is defeated by qualified privilege.

      B.    <u>Vicarious Liability</u>

Even if the defamatory statements at issue were not protected by qualified privilege, plaintiff's defamation claim would still fail on the independent ground that plaintiff has not established any basis for imputing liability to either ACL or Penbroke for statements made by Bakreen and Tanimowo, both of whom were employees of RoRo Lagos. An agency relationship exists where there has been a "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." <u>Heredia v. United States</u>, 887 F. Supp. 77, 80 (S.D.N.Y. 1995), quoting <u>In re Shulman Transp. Enters., Inc.</u>, 744 F.2d 293, 295 (2d Cir. 1984). Essential to the finding of an agency is a determination "that the agent acts subject to the principal's direction and control." <u>Heredia</u>, 887 F. Supp. at 80. Where an agency relationship exists, the doctrine of *respondeat superior* imputes liability to a principal "for the tortious conduct of his agent only when the agent acts within the scope of the employment relationship." <u>Id</u>. at 81.

Plaintiff has not accused any ACL or Penbroke employee of defaming him. Consequently, any liability imputed to defendants must be predicated on the existence of an agency between defendants and the authors of the emails. Other than his conclusory allegations that Bakreen and Tanimowo are defendants' agents (<u>see</u> P. 56.1 Stmt. ¶¶ 16-18; P. Mem. at 3; P. Reply Mem. at ¶¶ 12-13), plaintiff has advanced no admissible evidence demonstrating that Bakreen and Tanimowo acted as agents of either of the defendants when sending the emails.

Bakreen and Tanimowo were not ACL or Penbroke employees (see ACL Mem. Exs. G-H; Brennan Decl. ¶ 5), nor had they entered into any sort of contractual relationship with defendants. (See ACL 56.1 Stmt. ¶ 19; cf. Brennan Decl. ¶ 5.) To the contrary, the evidence shows that Bakreen and Tanimowo were employees of RoRo Lagos, a nonparty carrier. While RoRo Lagos was subcontracted by Grimaldi, itself a subcontractor for ACL, to transport the vehicles from Italy to Nigeria, ACL has shown that RoRo Lagos and Grimaldi were, at most, independent contractors over which ACL exercised no direction or control. (See ACL 56.1 Stmt. ¶¶ 18-22.)[16] Absent any proof that would rebut this showing, defendants cannot be held liable for the wrongful acts of RoRo Lagos employees.

Thus, because the defamatory statements are protected by qualified privilege and because plaintiff has presented no evidence that would permit imputing the statements to either defendant, defendants' motions for summary judgment on plaintiff's defamation claim are granted.

## IV.    Additional State Law Claims

The complaint also alleges that defendants are liable for breach of fiduciary duty, unfair trade and business practices, civil conspiracy, deceptive and negligent misrepresentation, and fraud. (See Compl. ¶¶ 33-59.) However, as plaintiff has failed to respond to any of defendants' arguments supporting summary judgment on these claims, they have been abandoned. See Santiago v. Newburgh Enlarged City Sch. Dist., 485 F. Supp. 2d 327, 338 (S.D.N.Y. 2007)

---

[16] Moreover, whatever responsibility ACL may have delegated to its subcontractors with respect to the carriage of plaintiff's goods, there is no indication whatsoever in this record that RoRo Lagos or its employees acted as agents for ACL (let alone Penbroke), or under its control or direction, in making pronouncements about the merits of plaintiff's loss claim.

(granting defendant summary judgment "because plaintiff . . . abandoned th[e] claim by failing to respond to defendants' motion to dismiss it"); Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted, and plaintiff's motion for summary judgment is denied.

SO ORDERED.

Dated: New York, New York
August 28, 2008

GERARD E. LYNCH
United States District Judge

25